UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
APRIL W.,                        :
    Plaintiff,                   :
                                 :
v.                               :     Civil No. 3:22CV841(AWT)
                                 :
KILOLO KIJAKAZI, ACTING          :
COMMISSIONER OF SOCIAL SECURITY, :
    Defendant.                   :
```

## RULING AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff April W. appeals the Commissioner's final decision denying her application for disability insurance benefits ("DIB") pursuant to section 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3).

The plaintiff filed a motion "for an order reversing the decision of the Commissioner and remanding this matter for calculation and payment of benefits or, in the alternative, for further proceedings." Pl.'s Mem. (ECF No. 19) at 1.

The Commissioner filed a motion for an order affirming the Commissioner's decision, maintaining that "the Commissioner's findings are supported by substantial evidence and made by a correct application of legal principles". Def.'s Mot. (ECF No. 21) at 1.

For the reasons set forth below, the court concludes that the Administrative Law Judge ("ALJ") applied the correct legal principles and that the ALJ's findings are supported by

substantial evidence. Therefore, the Commissioner's final decision is being affirmed.

## I.  <u>Legal Standard</u>

"A district court reviewing a final [] decision . . . [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C § 405(g), is performing an appellate function." <u>Zambrana v. Califano</u>, 651 F.2d 842, 844 (2d Cir. 1981). The court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. <u>See</u> <u>Wagner v. Sec'y of Health & Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching a conclusion and whether the decision is supported by substantial evidence. <u>See</u> <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence "is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted).

Absent legal error, the court may not set aside the decision of the Commissioner if it is supported by substantial evidence. <u>See</u> <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial

2

evidence, shall be conclusive . . . ."). Thus, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. See Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

## II.  **Discussion**

The plaintiff contends that the ALJ erred in the following ways:

(A)  evaluating medical opinions (a treating physician's opinion, an opinion in support of an FMLA application, and state examiner opinions on initial review and reconsideration);

(B)  determining the severity of cervical spine and mental impairments; and

(C)  evaluating symptoms that formed the bases for plaintiff's residual functional capacity ("RFC").

With respect to residual functional capacity, the ALJ's Decision states:

> After careful consideration of the entire record, [the ALJ found] that the claimant has the residual functional capacity to perform **light work** as defined in 20 CFR 404.1567(b) except she can **occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and walk 2 hours in an 8-hour day; sit for 6 hours in an 8-hour day;** never climb ramps and stairs, ropes, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and

> must avoid vibrations and hazards such as heights and
> moving machinery.

R. 21 (emphasis added).

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing
> up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good
> deal of walking or standing, or when it involves sitting
> most of the time with some pushing and pulling of arm or
> leg controls. To be considered capable of performing a full
> or wide range of light work, you must have the ability to
> do substantially all of these activities. If someone can do
> light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit
> for long periods of time.

20 C.F.R. § 404.1567(b) (2024).

### A.   Medical Opinions

The plaintiff contends that the ALJ

> fails both to sufficiently 1) explain how he applied
> medical opinion evidence under §404.1520c and . . . 2) the
> conclusions reached . . . do not provide substantial
> evidence for this Court to affirm that decision.

Pl.'s Mem. (ECF No. 19) at 7.

The defendant contends that

> [t]he ALJ reasonably evaluated the medical evidence of
> record, including the opinion from Dr. Daniel George, the
> prior administrative findings from Dr. Jeffrey Holtgrewe
> and Dr. Firooz Golkar, and Dr. S. Balachandran's
> Certification of Health Care Provider for Family Member's
> Serious Health Condition (Family and Medical Leave Act),
> and substantial evidence supports the ALJ's RFC findings.

Def.'s Mem. (ECF No. 21-1) at 4 of 20.

The Code of Federal Regulations reads:

> We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision. . . . If any of the evidence . . . , including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine . . . disab[ility] based on the evidence we have.

20 C.F.R. § 404.1520b(b)-(b)(1) (effective March 27, 2017).

Section 404.1520c of the regulations addresses how an ALJ considers, and articulates the ALJ's consideration of, medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017[1]:

> (a) How we consider medical opinions and prior administrative medical findings. **We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.** When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.
>
> (b) How we articulate our consideration of medical opinions and prior administrative medical findings. We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior

---

[1] Because the plaintiff's claims were initially filed on December 4, 2018 (See R. 76, Ex. 2A at 1.), Section 404.1520c applies to this case.

administrative medical findings in your case record. Our
articulation requirements are as follows:

    (1) Source-level articulation. . . . [W]hen a medical
source provides multiple medical opinion(s) or prior
administrative medical finding(s)**, we will articulate
how we considered the medical opinions or prior
administrative medical findings from that medical
source together in a single analysis using the factors
listed in paragraphs (c)(1) through (c)(5) of this
section, as appropriate. We are not required to
articulate how we considered each medical opinion or
prior administrative medical finding from one medical
source individually.**

    (2) Most important factors. The factors of
**supportability (paragraph (c)(1) of this section) and
consistency (paragraph (c)(2) of this section) are the
most important factors** we consider when we determine
how persuasive we find a medical source's medical
opinions or prior administrative medical findings to
be. . . .  **We may, but are not required to, explain
how we considered the factors in paragraphs (c)(3)
through (c)(5) of this section,** as appropriate . . . .

    (3) Equally persuasive medical opinions or prior
administrative medical findings about the same issue.
When we find that two or more medical opinions or
prior administrative medical findings about the same
issue are both equally well-supported (paragraph
(c)(1) of this section) and consistent with the record
(paragraph (c)(2) of this section) but are not exactly
the same, we will articulate how we considered the
other most persuasive factors in paragraphs (c)(3)
through (c)(5) of this section for those medical
opinions or prior administrative medical findings in
your determination or decision.

(c) Factors. We will consider the following factors when we
consider the medical opinion(s) and prior administrative
medical finding(s) in your case:

    (1) Supportability. **The more relevant the objective
medical evidence and supporting explanations** presented
by a medical source are **to support** his or her medical
opinion(s) or prior administrative **medical finding(s),**

**the more persuasive** the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. **The more consistent** a medical opinion(s) or prior administrative medical finding(s) is **with the evidence from other medical sources and nonmedical sources** in the claim, **the more persuasive** the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical

finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. **We will consider other factors that tend to support or contradict a medical opinion or** prior administrative medical **finding. This includes,** but is not limited to, evidence showing a medical source has **familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements.** When we consider a medical source's familiarity with the other evidence in a claim, **we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.**

(d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section.

20 C.F.R. § 404.1520c (effective March 27, 2017) (emphasis added).

## 1. Daniel C. George, M.D.

As to the opinion of Daniel C. George, M.D. (R. 587-590, Exhibit 13F at 3-6), the plaintiff contends that the ALJ "failed to consider properly the factors mandated by §404.1520c" (Pl.'s Mem. (ECF No. 19) at 7) and that "the lay opinion[2] the ALJ must

---

[2] The plaintiff contends that the ALJ relied primarily on the opinions of the state agency consultants and "[s]ince the state agency consultants did not have Dr. George's treating notes and evidence, the ALJ was the lone arbiter of that evidence." Reply (ECF No. 22) at 4. However, the ALJ supported his conclusions with medical evidence from a variety of sources by citing to Exhibit 13F (Dr. George's medical records); Exhibit 15F (Zofia Mroczka, M.D.'s neurological consultation records); Exhibit 16F (1/7/20 Day Kimball Hospital Emergency Department admission records which include notes by Mark Notash, M.D., Triage Nurse May H. Ulrich, and previous 12/27/19 admission record MRI findings interpreted by David Zimmerman, M.D.); and 9F

apply . . . fails to provide substantial evidence" (Pl.'s Mem.

(ECF No. 19) at 7-8) for a number of reasons:

1. The ALJ used the term "well-supported" instead of

    "supported", and "well-supported" is "facially

    incompatible with the Commissioner's published

    reasoning accompanying the current regulations" and

    "shows the ALJ did not understand the purpose, intent,

    or nature of 20 C.F.R. 404.1520c."  See Pl.'s Mem.

    (ECF No. 19) at 8 and n.5 (citing 82 Fed. Reg. 5844,

    5858 (Jan. 18, 2017); Reply (ECF No. 22) at 3.[3]

---

at 25 (6/23/19 Day Kimball Hospital Emergency Department admission records
which include an assessment by Nurses Dino G. Soscia and Ester E. Lyon).

[3] The reasoning cited to by the plaintiff is as follows:

Comment: Some commenters were concerned that, by moving away from
assigning a specific weight to opinions and prior administrative
medical findings, we would add subjectivity into the decisionmaking
process and said we would only require our adjudicators to think about
the evidence but not provide written analysis. Other commenters
suggested that by requiring articulation on only two factors—
supportability and consistency—our decisions would not sufficiently
inform the individual or a reviewing Federal court of the
decisionmaker's reasoning, which would lead to more appeals to and
remands from the courts.

Response: While we understand the concerns in these comments, we are
adopting our proposal to look to the persuasiveness of medical opinions
and prior administrative medical findings for claims filed on or after
March 27, 2017. Our current regulations do not specify which weight,
other than controlling weight in a specific situation, we should assign
to medical opinions. As a result, our adjudicators have used a wide
variety of terms, such as significant, great, more, little, and less.
The current rules have led to adjudicative challenges and varying court
interpretations, including a doctrine by some courts that supplants the
judgment of our decisionmakers and credits as true a medical opinion in
some cases.

**By moving away from assigning a specific weight to medical opinions, we
are clarifying** both how we use the terms "weigh" and "weight" in final
404.1520c(a), 404.1527, 416.920c(a), and 416.927 and also clarifying
**that adjudicators should focus on how persuasive they find medical**

2. "Dr. George has been Ms. W[.]'s treating orthopedic
   surgeon throughout the relevant period". Pl.'s Mem.
   (ECF No. 19) at 8.[4]

---

**opinions and prior administrative medical findings** in final 404.1520c
and 416.920c. **Our intent in these rules is to make it clear that it is
never appropriate under our rules to "credit-as-true" any medical
opinion.**

**We are also stating in final 404.1520c(b). . . what minimum level of
articulation** we will provide in our determinations and decisions **to
provide sufficient rationale for a reviewing adjudicator or court.** In
light of the level of articulation we expect from our adjudicators, we
do not believe that these final rules will result in an increase in
appeals or remands from the courts.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg.
5844-01, 5857-58 (Jan. 18, 2017) (emphasis added).

The defendant contends that "a plain reading of the regulations and the
hearing decision makes clear that a 'well-supported' opinion is one where the
medical source has relied on relevant objective medical evidence and
explanations. See 20 C.F.R. § 404.1520c(c)(1)." Def.'s Mem. (ECF No. 21-1) at
8 of 20.

The comment and response express an intent to move away from weight
assignments towards articulation of persuasiveness through the two-factor
articulation of supportability and consistency, and the mandated
"supportability" factor is defined as follows:

**The more relevant the objective medical evidence and supporting
explanations** presented by a medical source are **to support** his or her
medical opinion(s) or prior administrative **medical finding(s), the more
persuasive** the medical opinions or prior administrative medical
finding(s) will be.

20 C.F.R. § 404.1520c(c)(1) (effective March 27, 2017) (emphasis added). The
court finds no error in the use of the term "well-supported" for purposes of
the ALJ's articulated rationale.

    [4] The court need not address this issue because the plaintiff conceded
that "[t]he Commissioner is correct that the ALJ is not <u>required</u> to
articulate how other factors were considered, but 'may explain how [he]
considered the factors in paragraphs (c)(3) through (c)(5) . . ., <u>as
appropriate</u>'".  Pl.'s Reply (ECF No. 22) at 3 (emphasis in original) (citing
20 C.F.R. § 404.1520c(b)(2)).

3. "The ALJ does not appear to have reviewed anything after" "May 31, 2019".  Pl.'s Mem. (ECF No. 19) at 9.[5]

4. The "ALJ articulates a conclusion, but provides no . . . citations, to a supportability analysis" (Pl.'s Mem. (ECF No. 19) at 10.), including "a lone 'Id.'" citation without being clear as to what evidence was being cited (Pl.'s Reply (ECF No. 22) at 7 (citing Pl.'s Mem. (ECF No. 19) at 8-9).).[6]

5. There is "no articulated consistency review". Pl.'s Mem. (ECF No. 19) at 11.[7]

6. The "ALJ also inconsistently assesses supportability." Pl.'s Mem. (ECF No. 19) at 8.[8]

---

[5] The ALJ cited Exhibits 9F, 13F, 15F, and 16F, medical records from June and December of 2019 and 2020.  See also n.2.

[6] The court finds no error in the ALJ's supportability articulation. See Part II.A.1.

[7] The court finds no error in the ALJ's consistency articulation. See Part II.A.1.

[8] The plaintiff contends that:

"Dr. George [] recited the findings supporting his opinion and also based his opinion upon the same September 6, 2018 lumbar surgery and a longer post-surgical timeframe. (R. 587). Dr. George also, most importantly, accompanied the opinion with his own treating notes – something the file-reviewers could not do. The Commissioner's argument (and ALJ's reasoning) that the consultants were partially persuasive because they "provided statements" is, therefore, irrelevant as it shows unequal application of the regulations to different sources.

. . . . The ALJ concluded only that the file-reviewing consultant opinions were "'partially supported by their review of the record.' The ALJ does not cite to or explain what evidence the consultants themselves provided in their review of the record [that] supports their conclusions – he cites only to other providers." (Pl. Br. 12, citing R. 24). The ALJ thus believed review of the file alone can support an

The defendant maintains that the ALJ considered Dr.
George's findings regarding the physical examination of the
plaintiff and reasonably concluded that his treatment notes did
not support the severity of the limitations set forth in his
opinion; that the ALJ cited to other medical evidence and
reasonably determined that it did not corroborate the disabling
limitations in Dr. George's opinion. See Def.'s Mem. (ECF No.
21-1) at 6-8 of 20.

The Decision reads:

I considered the opinion of Daniel C. George, M.D. (Exhibit
13F). In 2020, he opined that the claimant could sit and
stand/walk less than 2 hours in an 8-hour day. He opined
that the claimant requires position changes at will. He
opined that she requires unscheduled breaks, often. He
opined that she must elevate her legs above her heart. He
opined that she could never lift or carry any weight. He
opined that she would be "off task" 25% or more during a
workday, that she is incapable of even low stress work, and
that she would be out of work more than 4 days per month.

**This opinion is not well-supported or consistent with the
record as a whole.** In support of his opinion, Dr. George
notes that the claimant is in constant pain and experiences
weakness, numbness, and tingling. Objectively she walks
slowly and has a grimacing face with movement. These
statements are **partially, but not fully supportive of the
limitations opined**. His opined restrictions are **also not
fully supported by his treatment notes. Treatment notes**

---

opinion. Dr. George not only consulted his own files but also examined
<u>and</u> treated Ms. W[.]. Therefore, plain reading of the decision shows
the ALJ inconsistently applied supportability analysis in favor of the
state agency consultants.

Pl.'s Reply (ECF No. 22) at 8-9 (emphasis in original).  In making this
argument, the plaintiff ignores applicable standards and the full rationale
and support for the ALJ's findings as to the medical opinions of Dr. George
and the state agency consultants. The court has considered these elsewhere in
Part A.II.1.

**from mid to late 2019 from Dr. George show** that the claimant had ongoing pain, restricted lumbar motion, and tenderness over the sacrum and coccyx (Id.). However, she had **less atrophy and improved strength and sensation (Id.). She ambulated well with good flexibility in the lower extremities and no assistive device (Id.). She had a good position of her fusion hardware and had experienced a 60% improvement (Id.). She was alert and oriented. She was encouraged to wean down her medication (Id.).**

While his treatment notes support a limited ability to stand and walk due to ongoing pain, they do not support the more significant limitations opined. They **do not support a complete inability to lift and carry, limited ability to sit, or the need to elevate the lower extremities. They do not show that the claimant was in significant distress and would require time off-task or out of work.** Similarly, Dr. George's **opinions are not wholly consistent with the record. Other examinations** of the claimant **show** that she has ongoing low back and leg pain. However, **she is not in acute distress, is alert, oriented, and has intact cognition** (Exhibit **15F; 16F**). She has trouble with heel and toe walking, limited reflexes, and some **giveway** weakness at the hips, but **mostly has intact muscle bulk, tone, and strength, intact coordination, and intact sensation** (Exhibit **15F**). While her **gait** is noted to be antalgic at times, it is **also noted to be steady** (Exhibit **9F at 25; 15F**). She **has not required the regular use of an assistive device.** While **the record** documents significant limitations due to the claimant's back pain, it **does not document the severity of the limitations opined** by Dr. George. His opinions are **not persuasive.**

R. 24-25 (emphasis added).

Here, the ALJ articulated the reason for finding Dr. George's opinion not persuasive, which was that the opinion was not fully supported by his own treatment notes or wholly consistent with other medical evidence.

The ALJ articulated the supportability factor and the record supports the ALJ's findings. The ALJ explained that Dr.

George's explanations for the opined limitations (constant pain, weakness, numbness, and tingling, walking slowly, and grimacing with movement) were partially, but not fully, supportive of a complete inability to lift and carry, limited ability to sit, and the need to elevate the legs; and the treatment notes do not show that the claimant was in significant distress and would require time off-task or out of work. To support his conclusion, the ALJ cited to Dr. George's treatment notes (Ex. 13F), which document that from mid to late 2019 the plaintiff had less atrophy and improved strength and sensation, she ambulated well with good leg flexibility, she did not need an assistive device, her fusion hardware was in a good position, she experienced 60% improvement, she was alert and oriented, and she was encouraged to wean down her medication.[9]

---

[9] See R. 593-94, 13F at 9-10 (5/31/19 records noting "Discectomy and Fusion 9/6/2018", that plaintiff reported "no assistive devices" despite a prescription for "one rolling walker for daily use", was "feel[ing] better", "legs are improving", "increased strength" and "less atrophy"; examination findings include "good coordination", "alert and oriented", "incision [] well-healed", "seems to have less atrophy and improved strength and sensation", "ambulating really well", "flexible in the lower extremities", "does not use a cane", "[g]ood position of a device and bone graft and pedicle screw fixation", "solid fusion healing", "60 percent [i]mproved . . . including some of her atrophy and lower extremity symptoms", and "I have recommended she continue to wean down to lower doses" in attempt to "manag[e] chronic opioid usage"); R. 595-96, 13F at 11-12 (6/28/19 records noting that the plaintiff reported "no assistive devices" despite a prescription for a "rolling walker for daily use"; findings include "[n]o localized joint swelling" or "stiffness", "good coordination, no tingling, and no numbness", "[n]o neurological changes in the lower extremities", "[g]ood position of pedicle screw fixation", "insistent that she is weaning off of her Gabapentin. . . . EMG in April . . . negative. . . . At some point . . . seriously attempt to wean her down to lower doses of opioid pain medication especially if she continues alcohol usage."); R. 597-98, 13F at 13-14 (12/12/19 records noting "no assistive devices" despite prescription, "symptoms have plateaued", "[n]o localized joint swelling", "good

Also, the ALJ articulated the consistency factor and supported his findings by citing to Exhibits 9F, 15F and 16F, which reflect that other examinations indicated that the plaintiff was not in acute distress, was alert, oriented, and had intact cognition, mostly had intact muscle bulk, tone, and strength, intact coordination and sensation, had a gait that was steady at times, and did not regularly require use of an assistive device.[10]

Other exhibits also support the ALJ's findings.[11]

---

coordination", "[w]ell-healed incision", and "[n]o motor or sensory changes").

[10] See R. 506, Ex. 9F at 25 (6/23/19 Day Kimball Hospital admission assessment by Emergency Department Nurse Dino G. Soscia noting "strong" "[a]bility to [m]ove" all limbs and "[s]ensation intact" and 6/24/19 notes by Emergency Department Nurse Esther E. Lyon observing "Pt ambulating in hallway with steady gait. No signs of acute distress or pain upon ambulation."); R. 613-14, 616-17, Ex. 15F at 1-2, 4-5 and R. 578-79, 12F at 1-2 (8/14/19, 10/22/19, 3/20/20 neurological consultation records of Zofia Mroczka, M.D. finding plaintiff "[a]lert and oriented" with "[n]ormal speech and comprehension", "[m]ini-mental 30/30", "[n]ormal sensation over face"], "[m]uscle bulk, tone, and strength within normal limit" (R. 579, 614, 617), "no lower back pain, no neck pain" on 8/14/19 (R. 616), "disc bulge decrease" with "normal vertebral body alignment", and "without significant canal or foraminal stenosis, marrow edema or intramedullary signal abnormality" (R. 578, 616, 613); Ex. 16F (1/7/20 Day Kimball Hospital Emergency Department admission notes of Attending Physician Mark Notash, finding "Neg,Neuro: Neg,Psych: Neg,Musculoskeletal"; "Full ROM" of neck, "Motor-MAE-Bilaterally/Sensory-Gross Sensory Intact/Coordination-normal", "[f]ull ROM" of extremities with "some muscle wasting of thighs . . . patient left prior to receiving treatment/getting work up as ordered" (R. 622) and "Condition – Good" (R. 623); ED Triage Nurse May H. Ulrich noted "Mode-Walked" (R. 628) and previous 12/27/19 admission record MRI findings interpreted by David Zimmerman, M.D. such as "marrow signal [] within normal limits", "straightening of the normal cervical lordosis . . . [n]o cord signal abnormality", "[n]o disk abnormality at C2-C3 and "[m]inimal annular bulge and endplate spurring without central canal stenosis or foraminal encroachment" at C3-C4 (R. 632).).

[11] See R. 452, Exhibit 4F at 2 (12/21/18, three months after surgery, Dr. George noted plaintiff was "alert and oriented", "incision is completely benign and nontender, "[g]ood strength and range of motion with the lumbar spine", "good sensation"); R. 473, Exhibit 8F at 2 (1/18/19 records from Dr.

The court finds no error in the ALJ's application of 20 C.F.R. § 404.1520c to Dr. George's opinion, and substantial evidence supports the ALJ's findings. Where there is substantial evidence, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

### 2. Balachandran, M.D.

As to the opinion of S. Balachandran, M.D. (R. 603-606, Ex. 14F at 2-5), the plaintiff contends that "[t]he ALJ's finding that Ms. W[.] 'reported chronic pain limiting her ability to perform activities, rather than flares' is inconsistent with the record and with common sense." Pl.'s Reply (ECF No. 22) at 10.

The defendant contends that substantial evidence supports the ALJ's evaluation that Dr. Balachandran's opinion was unpersuasive because that opinion:

> . . . did not specify Plaintiff's functional limitations and only generally stated she would have difficulty with daily activities when her pain flared . . . [which] was partially supported by Dr. Balachandran's explanation but was not consistent with the overall record which showed chronic pain rather than severe flare ups . . . . Substantial evidence supports this conclusion, as Plaintiff's treatment records consistently described chronic pain and the record is devoid of mentions of "flare-ups" (R. 366, 462, 571, 613, 628). . . .

---

George noted "alert and oriented", "[w]ell-healed incision", "full range of motion in her cervical spine", "don't detect a focal motor or sensory deficit", "[g]ait is slightly unsteady", and "[s]he is fully ambulatory and does not use a cane"); R. 463-64, Exhibit 7F at 2-3 (4/10/19 neurologist Anthony G. Alessi, M.D. noted "no acute distress", "full range of motion" in her extremities, "[a]lert and fully oriented, good fund of knowledge", and gait, sensation and coordination were normal).

Def.'s Mem. (ECF No. 21-1) at 12-13 of 20.

The Decision reads:

I considered the opinion of S. Balachandran, M.D. (Exhibit l4F). **In support of an FMLA application,** Dr. Balachandran opined that the claimant would require ongoing care for her impairment and that her condition would cause episodic flare-ups periodically preventing her from participating in normal daily activities and requiring additional medical care. He opined that the flares would occur two times per week. This opinion is **partially supported by** Dr. Balachandran's **explanation that the claimant has low back and leg pain due to herniated discs.** However, it is **not fully consistent with the record.** The record shows that the **claimant reported chronic pain limiting her ability to perform activities,** rather than flares. While the record documents a recent **emergency room visit for increased back pain, the claimant left without care** (Exhibit 16F). The **record otherwise does not document severe flares** of pain. Further, Dr. Balachandran's **opinion only generally reports that the claimant would be prevented from daily activities. It does not further specify her functional limitations.** This opinion is **not persuasive.**

R. 25 (emphasis added).

Here, the ALJ found that Dr. Balachandran's opinion was not persuasive and articulated the required factors: supportability (partially supported by low back and leg pain due to herniated discs) and consistency with the record (record does not document severe flares of pain except on a recent emergency room visit for increased back pain where the claimant left against medical advice and without receiving treatment and the plaintiff reported chronic pain limiting her ability rather than flares).

To support his findings, the ALJ cited Exhibit 16F. See R. 622-23, 628, Ex. 16F at 4-5, 10 (noting on 1/7/20 hospital

admission that plaintiff presented with "Abdominal Pain abd and
back for 2 Week(s) . . . acute on chronic. . . . Back Pain . . .
. Neg,Musculoskeletal . . . Neuro: Motor-MAE-
Bilaterally/Sensory-Gross Sensory Intact/Coordination-normal . .
. Full ROM . . . Looks Comfortable; Not Ill Appearing . . . some
muscle wasting of thighs noted that she says has been developing
over the past 2 years . . . . Condition – Good . . . Patient
left AMA or eloped . . . without instructions or treatment").

    The record documents chronic pain and the plaintiff presents
no evidence of weekly, severe flare-ups. See R. 366 (noting on
2/23/18 "20 year history of low back pain"), R. 462 (noting on
4/10/19 "chronic symptoms of low back pain"), R. 571 (noting on
7/26/19 "chronic" low back pain), R. 628 (noting on 1/7/20 "pain
x 1-2 years in abd. Now worsening and going down legs."), R. 613
(noting on 3/20/20 "chronic low back pain . . . for almost 10
years"). The plaintiff cites to one other medical record in
support of Dr. Balachandran's opinion that the plaintiff is
expected to experience twice-weekly flare-ups (R. 440 (12/2/2017
Day Kimball Hospital Emergency Department admission records))
and the Plaintiff's Statement of Material Facts (ECF No. 20) at
3, para. 18. See Pl.'s Mem. (ECF No. 19) at 14. That record is
both outside the alleged onset date and insufficient to support
an opinion that the plaintiff will suffer twice weekly severe
flare-up for a prolonged period. In addition, Dr. Balachandran's

opinion was written to support an FMLA application, not to evaluate the plaintiff's functional limitation under circumstances such as these.

The court finds no error in the ALJ's application of 20 C.F.R. § 404.1520c to Dr. Balachandran's opinion, and substantial evidence supports the ALJ's findings. Where there is supporting substantial evidence, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

### 3.   State Agency Examiners

As to the opinions of state examiners Dr. Jeffrey Holtgrewe on initial review (R. 66-75, Exhibit 1A) and Dr. Firooz Golkar on reconsideration (R. 77-88, Exhibit 3A), the plaintiff contends that the ALJ "misapplies §404.1520c(c)(1) . . . by seeking supportability in records other than the explanations provided by the consultants themselves"[12], that the ALJ "fail[ed] to perform a supportability analysis", "his consistency analysis

---

[12] The defendant contends that "for the prior administrative findings from non-examining physicians, a discussion of supportability will necessarily entail consideration of the medical evidence from other providers upon which the state agency consultants relied, as well as the consultants' explanations for their findings." Def.'s Mem. (ECF No. 21-1) at 12 of 20. The court agrees. The plaintiff's assertion is conclusory and unsupported.

is . . . inconsistent[13] with records after[14] the date of the state agency non-examining opinions", and that the record shows that the plaintiff requires a cane[15].  Pl.'s Mem. (ECF No. 19) at 12-13 (emphasis in original).

The defendant contends that

both Dr. Holtgrewe and Dr. Golkar provided statements in support of their opinions, explaining they were based on

---

[13] The plaintiff states, "The ALJ also cites to his exhibit 13F page 9, dated June 28, 2019 for the proposition that Ms. W[.] was ambulating 'without an assistive device.' [] This is untrue as that exact same page shows 'assistive devices utilized by the patient today: bilateral knee braces.'" Pl.'s Mem. (ECF No. 19) at 12.

The defendant contends that "Exhibit 13F, page 9, refers to Tr. 593, a treatment note dated May 31, 2019, not June 28, 2019 (Tr. 593)." Def.'s Mem. (ECF No. 21-1) at 10 of 20. The May 31, 2019, treatment note states that "She reported: Orthopedic options: no assistive devices", that the plaintiff was "ambulating really well", was "very flexible in the lower extremities", and "[s]he does not use a cane." R. 593, 594. It contains no reference to a knee brace. Therefore, the court finds no inconsistency.

[14] The plaintiff contends that the ALJ did not consider the prior administrative findings in the context of medical evidence provided after the opinions were rendered. See Pl.'s Mem. (ECF No. 19) at 12. Dr. Golkar signed his reconsideration findings on June 10, 2019. See R. 88.

The defendant contends that "[w]hen discussing the persuasiveness of this evidence, the ALJ explicitly considered the factor of consistency in relation to Exhibits 9F, 10F, and 13F". Def.'s Mem. (ECF No. 21-1) at 11. These exhibits include medical records after June 10, 2019. See R. 482-521, 9F at 1-40 (6/23/19 Day Kimball Hospital Emergency Department admission records); R. 551-53, 10F at 4-6 (6/28/19 medical records of encounter with Daniel George, M.D.); R. 595-98, 13F at 11-14 (6/28/19 and 12/12/19 medical records of encounters with Daniel George, M.D.).  See also n.2.

[15] In support of this contention, the plaintiff cites to the record at 244, 324, 342, 379, 381, and 388. See Pl.'s Mem. (ECF No. 19) at 13. However, these treatment records provide substantial evidence that the plaintiff sometimes used a cane prior to her surgery but did not typically require one post-surgery. On July 10, 2018, Dr. George's medical records note "She ambulatory cane." R. 388. On August 29. 2018, Dr. George's records note "She reported: Orthopedic options: assistive devices utilized by the patient today: cane". R. 381. On September 6, 2018, the plaintiff underwent surgery. See R. 378. Dr. George's records for September 6, 2018, under history of present illness, note that "She reported: Orthopedic options: no assistive devices" and also "She is using a cane and . . . . tries to limit these." R. 324. On September 6, 2018, Hartford Hospital admission records contain a note from Heather Mattison, PT: "Currently Used at Home" a "cane"; "pain rating

Plaintiff's then-recent lumbar surgery and observed improvement post-surgery (R. 69-70, 73, 82-83, 85-86, 86). The ALJ also reasonably concluded that Dr. Golkar's opinion that Plaintiff might require an assistive device was not consistent with the evidence of record which showed that, prior to and immediately after her surgery, Plaintiff occasionally used an assistive device but subsequently she was regularly observed to walk without an assistive device (R. 24, 473, 506, 561, 593, 595, 597).

Def.'s Mem. (ECF No. 21-1) at 11 of 20.

The Decision reads:

First, I considered the prior administrative medical findings of the State agency medical consultants (Exhibit 1A-4A). At the initial determination, Jeffrey Holtgrewe, M.D. opined that the claimant could perform light work with an ability to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and stand/walk and sit 6 hours in an 8-hour day. At the reconsideration determination, Firooz Golkar, M.D. opined that the claimant had similar limitations, but was further limited in her ability to stand and walk. He opined that she could stand and walk 3 hours. He noted that she may require an assistive device for long walks or rough terrain.

These opinions are **partially supported** by their review of the record. Dr. Golkar explained that the claimant was

---

does not match func mob as gait improved w/ increased duration but pt reports increased pain. Able to hold easy conversation w/ RPT thru out walk w/ no apparent distress noted." R. 342, Ex. 1F at 24. On September 14, 2018, Dr. George's records note "She has good strength and sensation to the lower extremity. Negative straight leg raise. . . . She is doing relatively well . . . . She does have some pain and spasms which is not unusual one week post-op. . . . She is using a walker and may switch to a cane". R. 379. On January 7, 2019, the plaintiff self-reported in a Function Report – Adult Form that she uses a "cane" prescribed "since surgery" for "getting off the toilet". R. 244. On January 18, 2019, Dr. George's records note that "She is fully ambulatory and does not use a cane." R. 473. On February 22, 2019, Dr. George's records note that "She is fully ambulatory and does not use a cane." R. 561. On May 31, 2019, Dr. George's records note that "She reported: Orthopedic options: no assistive devices" despite a prescription for "one rolling walker for daily use". R. 593. On June 23, 2019, the Day Kimball Hospital Emergency Department admission notes of Nurse Esther E. Lyon read "Pt ambulating in hallway with steady gait. No signs of acute distress or pain upon ambulation." R. 506. On June 28, 2019, Dr. George's records note "She reported: Orthopedic options: no assistive devices" despite a prescription for "one rolling walker for daily use". R. 595. On December 12, 2019, Dr. George records note the same. R. 597.

**status post lumbar fusion surgery.** He explained that she had **documented quadriceps atrophy.** While these findings are supportive of the limitations opined, I note that the **use of an assistive device is not consistent with the record as a whole.** The record shows that the claimant has ongoing low back pain with radiation to the lower extremities. At times, she has some decreased strength and sensation and **at** other **times, strength and sensation are intact.** She has documented **atrophy** in the quadriceps, that was **reportedly improving after her surgery** (Exhibit 2F at 14,17; 8F at 9; 10F at 14). While examination of the claimant prior to her surgery and immediately after showed some occasional use of an assistive device, it was not regular (Exhibit 2F). After her surgery, she was **regularly observed to walk without an assistive device** (Exhibit 9F at 25; 10F at 14; 13F at 9, 13). Therefore, **while the record remains consistent with significant limitations in standing and walking, it does not show that the claimant has required the use of an assistive device. The opined limitations are otherwise persuasive.**

R. 24 (emphasis added).

Here, the ALJ articulated the reason for finding the administrative findings of Drs. Holtgrewe and Golkar persuasive except for the required use of an assistive device. The ALJ articulated supportability (status post lumbar fusion surgery and documented quadriceps atrophy) and consistency (at times strength and sensation were intact, she reported improvement of quadriceps atrophy after her surgery, use of an assistive device was not regular, and after surgery she was regularly observed to walk without an assistive device).

The state medical examiners provided explanations to support their findings[16], the medical records also support their findings[17], and the record also supports the consistency finding[18].

---

[16] See R. 69-70 (Dr. Holtgrewe reports "Conclusion: . . . now more than 4 months s/p L3-4 and L4-5 decompression w fusion and fixation. She is making improvements in all areas."); R. 73 (Dr. Holtgrewe reports "RFC - Additional Explanation . . . claimant . . . , Doing well. Four months status post surgical procedure making improvements in all areas. No numbness. Weakness in right angle and foot markedly improved. Some atrophy in distal quad but improving Strength four in anterior tibialis."); R. 82-83 Dr. Golkar reports "Conclusion: . . . now more than 4 months s/p L3-4 and L4-5 decompression w fusion and fixation. She is making improvements in all areas."); R. 85-86 (Dr. Golkar noted under "Explain exertional [and lower on p. 85 postural] limitations and how and why the evidence supports your conclusions. Cite specific facts upon which your conclusions are based: BACK PAIN S/P LAMINECTOMY BILAT QUAD ATROPY, CLAIMANT MAY REQUIRES TO USE HHAD FOR LONG WALK OR ROUGH TERRAIN."); R. 86 (Dr. Golkar reports "RFC - Additional Explanation LIMITATIONS IN RFCF BASED ON OBJECTIVE FINDINGS IN CURRENT MER").

[17] See R. 374, Ex. 2F at 14 (11/19/18 records from Dr. George note "atrophy . . . improving. She has full strength in anterior tibialis on the right and good sensation in the right lower extremity without deficit."); R. 377, Ex. 2F at 17 (10/18/18 records from Dr. George note "mild atrophy in the right thigh. . . . good strength and sensation distally including anterior tibialis which is 5 over 5. . . . Hopefully we can wean down on to a lower dose or no medicine at all at some point."); R. 480, Ex. 8F at 9 (4/19/19 records from Dr. George note "some atrophy . . . . good distal strength and sensation"); R. 561, Ex. 10F at 14 (2/22/19 records from Dr. George note "I don't detect a focal motor or sensory deficit. She is fully ambulatory and does not use a cane. . . . Independent MRI of the lumbar spine was reviewed . . . . There is no evidence of significant foraminal or central compression of the nerves or residual disc herniation.").

[18] See R. 399, Ex. 2F at 39 (3/23/18 records from Dr. George note "She reported: Orthopedic options: no assistive device"); R. 396, Ex. 2F at 36 (4/13/18 records from Dr. George note same); R. 393, Ex. 2F at 33 (4/27/18 records from Dr. George note same); R. 390, Ex. 2F at 30 (6/6/18 records from Dr. George note same); R. 384, Ex. 2F at 24 (8/1/18 records from Dr. George note same); R. 473, Ex. 8F at 2 (1/18/19 records from Dr. George note "She is fully ambulatory and does not use a cane."); R. 561, Ex. 10F at 14 (2/22/19 records from Dr. George note "She is fully ambulatory and does not use a cane."); R. 593, Ex. 13F at 9 (5/31/19 records from Dr. George note that although there was a prescription for "one rolling walker for daily use", "She reported: Orthopedic options: no assistive devices"."); R. 506, Ex. 9F at 25 (6/23/19 Day Kimball Hospital Emergency Department admission records note Nurse Esther E. Lyon's observations: "Pt ambulating in hallway with steady gait. No signs of acute distress or pain upon ambulation."); R. 595, Ex. 13F at 11 (6/28/19 records from Dr. George note that although there was a

The court finds no error in the ALJ's application of 20 C.F.R. § 404.1520c to Dr. Balachandran's opinion, and substantial evidence support the ALJ's findings. Where there is supporting substantial evidence, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

### B.   Severity of Impairments

The plaintiff contends that the ALJ erred in finding the plaintiff's cervical spine and mental impairments non-severe.

The defendant contends that the ALJ reasonably concluded that the cervical spine and mental impairments did not significantly affect the plaintiff's ability to perform work-related activities.

At Step Two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe". See 20 C.F.R. § 404.1521 (effective March 27, 2017). "[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source." Id.

> (a)  .  .  .  .  An impairment or combination of impairments is **not severe if it does not significantly limit your physical or mental ability to do basic work activities.**

prescription for a walker ("please dispense one rolling walker for daily use"), "She reported: Orthopedic options: no assistive devices"); R. 597, Ex. 13F at 13 (12/12/19 records from Dr. George note the same).

(b)  .  .  .  .  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522 (a), (b) (effective March 27, 2017) (emphasis added).

It is the plaintiff's burden to show "that [s]he has a medically severe impairment or combination of impairments . . . ." Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

"[T]he standard for a finding of severity under Step Two of the sequential analysis is de minimis and is intended only to screen out the very weakest cases." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). See also Parker-Grose v. Astrue, 462 F. App'x 16, 17 (2d Cir. 2012) (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing Bowen v. Yuckert, 482 U.S. 136, 158 (1987) (O'Connor, J., concurring, joined by Stevens, J. ("'Only those [plaintiffs] with slight abnormalities that do not

significantly limit any 'basic work activity' can be denied
benefits without undertaking th[e] vocational analysis.'")).

    If an ALJ errs by concluding that an impairment is non-
severe, the error would be harmless where the sequential
evaluation process continued and the plaintiff's "non-severe"
impairments were analyzed. See Reices-Colon v. Asture, 523 Fed.
Appx. 796, 798 (2d Cir. 2013) (holding harmless any error in
finding conditions non-severe where those conditions were
considered with the severe impairments during the remaining
steps of the sequential analysis).

    Under Title II, a "disabling impairment(s)" "must be
expected to result in death or must have lasted (or be expected
to last) for at least 12 continuous months from the date of
onset." Social Security Ruling ("SSR") 82-52 (effective August
20, 1980); 20 C.F.R. § 404.1509 ("Unless your impairment is
expected to result in death, it must have lasted or must be
expected to last for a continuous period of at least 12 months.
We call this the duration requirement."). See also 42 U.S.C. §
423(d)(1)(A). "Severe impairments lasting less than 12 months
cannot be combined with successive, unrelated impairments to
meet the duration requirement." SSR 82-52 (effective August 20,
1980).

    The onset date of April 24, 2018 is undisputed.

### 1.   Cervical Spine Impairments

The plaintiff contends that the "ALJ erred in finding Ms. W[.]'s cervical impairment non-severe" because "[h]is findings were not supported by any medical source, but only his own interpretation of the medical evidence. Accordingly, his findings cannot be said to be supported by substantial evidence." Pl.'s Mem. (ECF No. 19) at 14.

The defendant contends that "the ALJ reasonably concluded that the Plaintiff's cervical [spine] impairment did not significantly affect her ability to perform work-related activities" and that the plaintiff failed to meet her "responsibility to prove that she has a severe impairment". Def.'s Mem. (ECF No. 21-1) at 13-14 of 20.

The Decision reads:

The claimant sustained an injury to her cervical spine years **prior to the alleged onset date** (Exhibit 10F at 16). **During much of the relevant period, she did not report significant cervical spine pain and** did not report **upper extremity symptoms** (Exhibit 7F at 1; 8F at 1; 10F at 16). Examination **showed full range of motion of the cervical spine with a negative Spurling's test and no end range discomfort** (Exhibit 9F at 4; 10F at 14). Toward the end of 2019, the claimant experienced intermittent neck pain and mid torso pain with **no paresthesia** (Exhibit 12F at 1). She reported some radiation to the left upper extremity (Exhibit 16F at 14). MRI of the cervical spine revealed disc protrusion resulting in mass effect upon the right C6 nerve root with moderate right foraminal encroachment and no central canal stenosis (Exhibit 16F at 14-15). Examination revealed **intact range of motion of the neck with intact strength, sensation, and reflexes in the upper extremities** (Exhibit 15F at 2; 16F at 4). When reporting on her activities of daily living, the claimant **mostly alleged**

> **limitation due to her low back and lower extremities,
> rather than her neck and upper extremities** (Exhibit 7E).
> She **mostly focused on her low back pain at the hearing.** I
> therefore find that this impairment is nonsevere.

R. 20 (emphasis added).

Here, the medical record supports the ALJ's finding:
Activities of daily living were impacted mostly by low back and
lower extremity limitations; there is medical evidence of full
range of motion at the cervical spine with a negative Spurling's
(a diagnostic test designed to evaluate cervical radiculopathy
(See https://www.ncbi.nlm.nih.gov/books/NBK493152/.)) and no
end-range discomfort; a "Negative Hoffmann's" (a cervical cord
compression diagnostic test (See
https://www.ncbi.nlm.nih.gov/books/NBK545156/.)); no difficulty
swallowing or chewing; no paresthesia or hand numbness; a normal
EMG; normal sensation over the face; normal muscle bulk, tone
and strength; and normal sensation to vibration, position and
temperature.[19]

---

[19] See R. 238-45, Ex. 7E at 1-8 (1/7/19 self-report of function and
activities of daily living mostly noting limitation due to low back and lower
extremities); R. 563, Ex. 10F at 16 and R. 472, 8F at 1 (1/18/19 encounter
with Daniel George, M.D. noting "No cervical pain although she had a previous
injury to the cervical region years ago."); R. 473, Ex. 8F at 2 on 1/18/19
and R. 561, 10F at 14 on 2/22/19 (encounter with Daniel George, M.D. noting
"Full range of motion of the cervical spine with negative Spurling's and no
end range discomfort" and "Negative Hoffmann's"); R. 462, Ex. 7F at 1
(4/10/19 encounter with neurologist Anthony G. Alessi, M.D. noting "She does
not describe any upper extremity symptoms. She has no difficulty with
swallowing or chewing."]; R. 485, Ex. 9F at 4 (6/23/19 Day Kimball Hospital
Emergency Department admission record by Mark Notash, M.D. noting on exam
"Neuro: Motor-Major Muscle Groups 5/5/Sensory-Gross Sensory
Intact/Coordination" and "Neck: NT Full ROM"); R. 578-79, Ex. 12F at 1-2
(10/22/19 consultation with Zofia Mroczka, M.D. noting complaints of
"intermittent neck pain" with "no paresthesia" and "no hand numbness";

Although the plaintiff cites to related evidence, she does not link that evidence to corresponding limitations during the period at issue that significantly limited the plaintiff's ability to do basic work activities such as sitting, lifting, pushing, pulling, reaching, carrying, or handling necessary to do most jobs.

The ALJ applied the correct legal principles and substantial evidence supports the ALJ's findings. Where there is supporting substantial evidence, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

### 2.   Mental Impairments

The plaintiff suggests that "suicidal ideation . . . and alcohol abuse disorder . . . are medically-determined

---

"complains to have intermittent neck pain . . . however no paresthesia . . . EMG 04/10/19 was normal . . . no hand numbness", "Normal sensation over face. . . . Muscle bulk, tone, and strength within normal limits . . . Reflexes: biceps, triceps 2+ . . . Sensation to vibration, position and temperature are normal throughout."); R. 632-33, Ex. 16F at 14-15 (12/27/19 Day Kimball Hospital Emergency Department admission records with MRI interpreted by David Zimmerman, M.D. noting "Neck pain and reported left upper extremity pain" and "Disc-osteophyte complex at C5-C6 with a right subarticular zone disc protrusion *potentially* resulting in mass effect upon the right C6 nerve root with *moderate right foraminal encroachment" and "[n]o central canal stenosis*." (emphasis added)); R. 622, Ex. 16F at 4 (1/7/20 Day Kimball Hospital Emergency Department admission records by Mark Notash, M.D. noting "Neck: NT Full ROM", "Neuro: Motor-MAE-Bilaterally/Sensory-Gross Sensory Intact/Coordination-normal"); R. 613-14, Ex. 15F at 1-2 (3/20/20 neurological consultation with Zofia Mroczka, M.D. noting "complains to have neck pain . . . however no paresthesia. . . . Cervical MRI-12/27/19-broad disk C5-C6, with disk excursion pressing on the C6 nerve root EMG 04/10/2019 was normal" but "no hand numbness", "Normal sensation over face. . . . Muscle bulk, tone, and strength within normal limit, . . . . Reflexes: biceps, triceps 2+ . . . . Sensation to vibration, position and temperature are normal throughout.").

impairments" and contends that the ALJ erred "in disregarding the hospitalizations for suicidal ideation" because they "demonstrate[] belligerence and" that the plaintiff has "difficulty interacting both with peers (her husband) and individuals in positions of authority (police and hospital staff)", that these "additional limitations . . . would contribute to time off-task and absences which would preclude work based on the VE testimony" or that "the combination of non-severe impairments with severe impairments is sufficient to account for limitations in other, non-exertional areas such as time off-task and absence due to pain and fatigue."[20]  Pl.'s Mem. (ECF No. 19) at 16-18.  The plaintiff also contends that the plaintiff's function report "does not provide substantial evidence" and that "this Court cannot properly evaluate the ALJ's conclusions".[21]  Pl.'s Mem. (ECF No. 19) at 18.

---

[20] The ALJ considered the two hospitalizations: "She received emergency room treatment for suicidal ideation on two occasions, in the context of alcohol use and was discharged within a short period." R. at 20. Even if the court assumed error, the error would be harmless because the plaintiff provides **no proof** that these isolated instances were significant enough to limit her ability to do basic work activity or that such a limitation would meet the durational requirement.

[21] In support of this contention, the plaintiff argues that the ALJ (1) "does not provide any explanation as to why some of the written statements are consistent with the records – but only when applied to contradict her own testimony"; (2) "fails to explain why this opinion is reliable and consistent for purposes of undermining Ms. W[.] but not when taken to support her limitations"; and (3) "fails to explain why the W[.]s' written function reports from January and February 2019 are given more weight than the in-court under-oath testimony provided by Ms. W[.] when relating her impairments and limitations. . . . The ALJ provides no rationale why the hearsay function reports are accepted over the in-hearing under-oath testimony . . . ."  Pl.'s Mem. (ECF No. 19) at 17-18.

The defendant contends that "the ALJ reasonably concluded
that the Plaintiff's alleged mental impairments did not
significantly affect[] her ability to perform work-related
activities" (Def.'s Mem. (ECF No. 21-1) at 14 of 20) and that
the "Plaintiff identifies no objective medical evidence from an
acceptable medical source showing" (Def.'s Mem. (ECF No. 21-1)
at 15 of 20) "moderate, marked, or extreme limitations in the
ability to understand, remember, or apply information; interact
with others; concentrate, persist, or maintain pace; and adapt
or manage oneself" (Id.).  Alternatively, the defendant contends
that any step-two error "is harmless because the ALJ found in
Plaintiff's favor at step two and continued with the sequential
evaluation."  Def.'s Memo (ECF No. 21-1) at 15 of 20.

The ALJ's evaluation of mental impairments is governed by
20 C.F.R. § 404.1520a. This evaluation technique helps the ALJ:

(1)   Identify the need for additional evidence to determine
      impairment severity;
(2)   Consider and evaluate functional consequences of the
      mental disorder(s) relevant to [the plaintiff's] ability
      to work; and
(3)   Organize and present [] findings in a clear, concise, and
      consistent manner.

20 C.F.R. §§ 404.1520a(a) (effective March 27, 2017).  For
medically determinable mental impairments, the ALJ must "specify
the symptoms, signs, and laboratory findings that substantiate
the presence of the impairment(s) and document [] findings in

31

accordance with paragraph (e)". 20 C.F.R. § 404.1520a(b)(1)
(effective March 27, 2017).

Section (e)(4) states that the ALJ's "decision must show
the significant history, including examination and laboratory
findings, and the functional limitations that were considered in
reaching a conclusion about the severity of the mental
impairment(s). The decision must include a specific finding as
to the degree of limitation in each of the functional areas
described in paragraph (c) of this section" (20 C.F.R. §
404.1520a(e)(4)), which includes the degree of limitation with
respect to the plaintiff's ability to "understand, remember, or
apply information; interact with others; concentrate, persist,
or maintain pace; and adapt or manage oneself" (20 C.F.R. §
404.1520a(c)(3)). If the degree of limitation is **"none" or
"mild," the impairment is generally "not severe, unless the
evidence otherwise indicates that there is more than a minimal
limitation in [] ability to do basic work."** 20 C.F.R. §
404.1520a(d)(1) (emphasis added).

The ALJ's decision reads:

The claimant has a depressive and anxiety disorder. At the
hearing, she explained that she experienced depression due
to her physical limitations and that this caused crying and
a lack of focus. The record shows that the claimant
reported symptoms of anxiety and depression to her
neurologist (Exhibit 15F). While she presented as anxious,
examination of **the claimant regularly presented as alert,
oriented, pleasant, with normal speech, normal
comprehension, and good fund of knowledge** (Exhibit 7F at 2;

15F; 12F at 2; 16F at 4). She scored **30/30 on Mini Mental**
State Examination, **indicative of normal cognitive
functioning** (Exhibit 12F; 15F). **Inconsistent with the
presence of a severe impairment, she did not seek
specialized treatment** for her mental impairments. She
received emergency room treatment for suicidal ideation on
two occasions, in the context of alcohol use and was
discharged within a short period (Exhibit 9F). While the
claimant reports **limitation in the performance of
activities of daily living, this appears to be mostly due
to her physical impairments** (Exhibit 7E). She otherwise
notes that she **does not have trouble getting along with
others, can handle stress, and can handle changes in
routine** (Id.). **She can care for personal needs, prepare
meals, shop by phone and computer, and visit with friends**
(Id.). She is **able to read and does arts and crafts**
(Exhibit 11E). At the hearing, she testified that she was
able to **spend time with her friend** who lived close by.

In finding that the claimant has a nonsevere mental
impairment, I have **considered the broad functional areas of
mental functioning** set out in the disability regulations
for evaluating mental disorders and in the Listing of
Impairments (20 CFR, Part 404, Subpart P, Appendix 1).
These four broad functional areas are known as the
"paragraph B" criteria. I find that the claimant has a
**mild limitation in understanding, remembering or applying
information, no limitation in interacting with others, mild
limitation in concentrating, persisting or maintaining
pace, and no limitation in adapting or managing oneself.**

Because the claimant's medically determinable mental
impairments cause no more than "mild" limitation in any of
the functional areas **and the evidence does not otherwise
indicate that there is more than a minimal limitation in
the claimant's ability to do basic work activities, they
are nonsevere** (20 CFR 404.1520a(d)(1)).

R. 20-21 (emphasis added).

Here, the ALJ clearly articulated specific and reviewable

reasons for finding no mental impairment other than a mild

limitation in understanding, remembering or applying information

and in concentrating, persisting or maintaining pace. The ALJ

considered the plaintiff's depressive and anxiety disorder, reports of crying and lack of focus, medical records and examinations, reported limitations in the performance of activities of daily living and the two episodic hospitalizations. The cited medical records provide a longitudinal picture of the plaintiff's overall degree of functional limitation. The ALJ rated the degree of the four broad areas of functional limitations. The ALJ noted that the evidence did not indicate more than a minimal limitation in ability to do basic work activities.

The record supports the ALJ's finding.[22] The plaintiff's own doctor indicated that no emotional or psychological factors

---

[22] See R. 369, Ex. 2F at 9 (5/1/2017 encounter with Scott A. Green, DO, noting "No confusion, no memory lapses or loss," "Psychological: No depression" and "alert and oriented x3", "no acute distress", "appropriate affect"); R. 367, Ex. 2F at 7 (2/23/18 encounter with Daniel George, M.D. noting "No confusion, no memory lapses or loss," "Psychological: No depression" and "alert and oriented"); R. 400, Ex. 2F at 40 (3/23/18, same); R. 397, Ex. 2F at 37 (4/13/18, same); R. 394, Ex. 2F at 34 (4/27/18, same); R. 391, Ex. 2F at 31 (6/6/18, same); R. 388, Ex. 2F at 28 (7/10/18, same); R. 385, Ex. 2F at 25 (8/1/18, same); R. 382, Ex. 2F at 22 (8/29/18, same); R. 379, Ex. 2F at 19 (9/14/18, same); R. 377, Ex. 2F at 17 (10/18/18, same); R. 374, Ex. 2F at 14 (11/19/18, same); R. 371 and 548, Ex. 2F at 11 and 10F at 1 (12/21/18, same); R. 473, Ex. 8F at 2 (1/18/19, same); R. 476, Ex. 8F at 5 (2/22/19, same); R. 478, Ex. 8F at 7 (3/22/19, same); R. 480, Ex. 8F at 9 (4/19/19, same); R. 460, Ex.  6F at 2 (2/22/19, same); R. 463, Ex. 7F at 2 (4/10/19 neurology visit with Anthony G. Alessi, M.D. noting "no acute distress", "Alert and fully oriented, good fund of knowledge, speech is clear"); R. 561, Ex. 10F at 14 (2/22/19, encounter with Scott A. Green, DO, noting "Neurological: No confusion, no memory lapses or loss . . . Psychological: No depression. . . . alert and oriented"); R. 559, Ex. 10F at 12 (3/22/19, same); R. 555, Ex. 10F at 8 (5/31/19, same); R. 552, Ex. 10F at 5 (6/28/19, same); R. 506, Ex. 9F at 25 (6/23/19 Day Kimball primary nurse assessment by Dino G. Soscia, noting "Mental status-Awake, alert and oriented to person, place and time"); R. 596, Ex. 13F at 12 (6/28/19 encounter with Scott A. Green, DO, noting "Neurological: No confusion, no memory lapses or loss . . . Psychological: No depression. . . . alert and oriented"); R. at 579, 568, 582, and 617, Ex. 12F at 2 and 5, 11F at 3, and 15F at 5 (8/14/19 consultation with neurologist Zofia Mroczka, M.D. noting "Alert and oriented

contributed to the severity of her symptoms and functional limitations. See R. 587-88, Ex. 13F at 3, Nos. 9-10 (1/16/20 Physical Medical Source Statement signed by Daniel George, M.D. noting that "No" "emotional factors contribute to the severity of . . . symptoms and functional limitations" and identifying no "psychological conditions affecting . . . physical condition" such as "Depression", "Anxiety" and other "Psychological factors"). The record also includes information regarding a phone call where the plaintiff was asked about her mental health and she indicated that she was not in treatment and that, although she gets depressed about her pain, it does not affect her ability to work. See R. 82, 3A at 6 (Firooz Golkar, M.D.'s notes reflecting details of a 5/22/19 call: "de also wanted to know if there is any mental health since there was mention of depression she reports no, she just gets really depressed due to the pain, but is not in any treatment with therapist/psychiatrist and does not affect her ability to work"); Social Security Ruling 16-3p  16-3P (effective Oct. 25, 2017) ("We will consider any statements in the record noted by

---

x3. Normal speech and comprehension. Mini-mental 30/30."); R. 598, Ex. 13F at 14 (12/12/19 encounter with Scott A. Green, DO, noting "Neurological: No confusion, no memory lapses or loss . . . Psychological: No depression. . . . alert and oriented"); R. 613, Ex. 15F at 1 (3/20/20 neurologic consultation with Zofia Mroczka, M.D. noting "Gabapentin [] made her more depressed" and adding "Gabapentin causes depression" to the list of allergies, suggesting depression was a side effect); R. 614, Ex. 15F at 2 (3/20/20 neurologic consultation with Zofia Mroczka, M.D. noting "Alert and oriented x3. Normal speech and comprehension. Mini-mental 30/30.")

agency personnel who previously interviewed the individual, whether in person or by telephone. The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.")

Although the plaintiff cites to related evidence of impairment and contends that mental impairments would contribute to work preclusive time off-task and absences, she does not provide proof that links that evidence to corresponding limitations that significantly limited her ability to do basic work activities during the period at issue.  Also, the plaintiff appears to challenge the ALJ's evaluation of the plaintiff's ability to interact with others, but she remains silent with respect to the remaining areas of function. See 20 C.F.R. § 404.1520a (c)(3) (effective March 27, 2017) ("We have identified **four broad functional areas** in which **we will rate** the degree of your functional limitation: **Understand, remember, or apply information;** interact with others; **concentrate, persist, or maintain pace; and adapt or manage oneself. . . .**") (emphasis added).  Moreover, the plaintiff presents no evidence that this limitation would meet the durational requirement.

Even if the court assumed that the ALJ erred, the error would be harmless because the ALJ identified other "severe"

impairments (lumbar spondylosis, status post L3-5 decompression
and fusion) and continued with the sequential evaluation
process, which included consideration of the limiting effects
of both severe and non-severe impairments and a vocational
analysis (See R. at 21-28.). See R. 26 ("Mentally, . . . [w]hile
she presents as anxious, she is mostly alert, oriented,
pleasant, and has intact cognition. She is able to socialize
with others, care for personal needs, and prepare simple meals.
She has not sought ongoing mental health treatment.")

Here, the record was "complete and detailed enough to
allow" the ALJ "to make a determination" about disability. 20
C.F.R. § 404.1512 (a)(2) (effective March 27, 2017). The ALJ
applied the correct legal principles and substantial evidence
supports the ALJ's findings. Where there is supporting
substantial evidence, the court must defer to the ALJ, even
where substantial evidence may also support the plaintiff's
position.

### C.  Evaluation of Symptoms

The plaintiff contends that "[t]he ALJ erred in his
assessment of Ms. W[.]'s credibility/subjective statements and
in assessing evidence related thereto. . . . under . . . Social
Security Ruling ("SSR") 16-3p" because the ALJ's conclusion was
based on a serious misunderstanding of the plaintiff's
statements by "focus[ing] incorrectly on 'improvement' after . .

. surgery", "mischaracteriz[ing]" "actual diagnoses and findings

on exam", and "widely misstat[ing] the full range of the

facts"[23]; because the ALJ "neglects . . . to discuss her

---

[23] The plaintiff contends that Genier's holding "that the ALJ's conclusion 'was based on so serious a misunderstanding of Genier's statements that it cannot be deemed to have complied with the requirement that they be taken into account" applies here. Pl. Mem. (ECF No. 19) at 19 (citing Genier v. Astrue, 606 F.3d 46, 51 (2d Cir. 2010)). The court disagrees. In Genier, the ALJ wrote that the claimant "was able to care for his dogs, vacuum, do dishes, cook, and do laundry" when in fact he indicated "that he *tried*" to do these tasks but "required the assistance of a parent . . . because of his severe fatigue." Genier, 606 F.3d at 50 (emphasis in original). "The claimant also testified at the hearing that he performs these household chores" but that testimony "did not pertain to the same time period as Genier's written statements". Id. It pertained to his "capacity at the time of the hearing". Id.

Here, the plaintiff contends that the ALJ "ignores the ultimate conclusion that she continued to have such severe back pain that Dr. Mroczka wanted to prescribe Methadone, and that the back surgery had failed." Pl.'s Mem. at 20. To support this assertion, the plaintiff cites to R. 567-569 and Pl.'s Statement of Facts (ECF No. 20) para. 35, which also supports the ALJ's findings. See R. 568, Ex. 11F at 4 (8/14/19 consultation with neurologist Zofia Mroczka, M.D. noting "Muscle bulk, tone, and strength within normal limit, except giving away weakness in both hip flexors. Reflexes: biceps, triceps, knee jerks, and ankle jerks are symmetrical bilaterally. Cerebellar: Finger-to-nose, heel-to-shin, and alternative finger movements are intact. No muscle spasm. Sensation to vibration, position and temperature are normal throughout. . . . Romberg [test used "to determine the integrity of the dorsal column pathway of the brain and spinal cord" (https://www.ncbi.nlm.nih.gov/books/NBK563187/)] is negative.").

As to mischaracterization of diagnoses and findings and misstating the full range of facts, the plaintiff cites to R. 370-371, 462-463, 479-480, 551-553, 593-594 and to Pl.'s Statement of Facts (ECF No. 20) paras. 24, 29, 30, 31, 34, suggesting that other evidence or statements should have been relied on. However, these records also support the ALJ's findings. See R. 370-371, Ex. 2F at 10-11 (12/21/18 records from Daniel George, M.D. note "Her surgery was over 3 months ago. . . . Good strength and range of motion with the lumbar spine. . . . Generally good sensation in the lower extremities without deficit."); R. 462-463, Ex. 7F at 1-2 (4/10/19 records from neurologist Anthony Alessi, M.D. note "in no acute distress . . . Extremities: no peripheral edema, full range of motion . . . Motor exam: Prominent atrophy of the quadriceps muscles with weakness noted at 3/5 bilaterally. She has normal adductor strength. . . . Coordination: Normal rapid alternating movements. Sensory: Normal pinprick, vibration, light touch and temperature."); R. 479-480, Ex. 8F at 8-9 (4/19/19 records from Daniel George, M.D. note "good distal strength and sensation . . . no marked or severe changes. No ongoing denervation."); R. 551-553, Ex. 10F at 4-6 (6/28/19 records from Daniel George, M.D. note "no assistive devices" despite prescription for "one rolling walker for daily use", "Neurological: . . .

medication regime"[24]; and because the ALJ "erroneous[ly] treat[s] the third-party function report of Ms. W[.]'s husband" . . . its contents are entirely absent from the ALJ's credibility/symptom evaluation"[25]. Pl.'s Mem. (ECF No. 19) at 18-22.

The defendant contends that substantial evidence supports the ALJ's finding "that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms was not entirely consistent with the evidence of record". Def.'s Mem. (ECF No. 21-1) at 15.

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the

---

good coordination, no tingling, and no numbness."); R. 593, Ex. 13F at 9 (5/31/19 records from Daniel George, M.D. note "She reported: Orthopedic options: no assistive devices" despite a prescription for "one rolling walker for daily use", "started to feel better", "her legs are improving and she has increased strength there. She notes atrophy."); R. 594, Ex. 13F at 10 (5/31/19 records from Daniel George, M.D. note "good coordination", "incision is well-healed", "She seems to have less atrophy and Improved strength and sensation. She is ambulating really well", was "very flexible in the lower extremities", "does not use a cane", "is 60 percent Improved at this point including some of her atrophy and lower extremity symptoms", and "[a]t this point we are managing chronic opioid usage for her and I have recommended she continue to wean down to lower doses if possible."). If the correct legal principles were applied and there is supporting substantial evidence for the ALJ's findings, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

[24] The ALJ discussed the plaintiff's medication: "She was encouraged to wean down her medication" . . . . She continued to use medication including Percocet and Flexeril". R. 23, 25. A more detailed explanation of the medication regimen was not required given the surrounding facts and the applicable standard.

[25] The ALJ considered Mr. W.'s third-party statement but found that "he is not a medical source and his reported limitations are not wholly consistent with the record. . . . [W]hile his assessment was considered, greater consideration has been given to the totality of the objective medical evidence." R. 26. Nothing more was required.

first step, the ALJ must decide whether a claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Genier, 606 F.3d at 49. Step one is not at issue here.

"[A]t the second step, the ALJ must consider the extent to which the [plaintiff's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." Id. at 49 (internal quotation marks and citation omitted). "That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability." Id.; 20 C.F.R. § 404.1529(a) (effective March 27, 2017) ("statements about your pain or other symptoms will not alone establish that you are disabled").

> There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to

work.

20 C.F.R. § 404.1529(a) (effective March 27, 2017).

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p (effective Oct. 25, 2017).  See also Mongeur v. Heckler, 772 F.2d 1033, 1040 (2d Cir. 1983) (remand is not required where the evidence of record permits the court to glean the rationale of the ALJ's decision).

The ALJ's Decision reads:

The claimant alleges disability primarily due to a back impairment. At the hearing, the claimant testified that she has a long history of low back pain. The severity of her low back pain increased and she eventually required surgery on her lumbar spine. Since the surgery, she has experienced increased pain. She rates **her pain as a 7-8/10** in terms of intensity. She has trouble standing, walking, and sitting for prolonged periods due to pain. **She estimated that she could stand for 10 minutes before her pain is too severe that she must sit.** She explained that she has **trouble with her ability to pay attention and concentrate** due to pain. She also has **trouble with her ability to sleep.** She therefore is tired during the day and requires naps. When walking, she sometimes **falls.** She estimated that she falls **once per day.** Although the use of an assistive device has been recommended, she testified that **she did not use a cane and that she could not afford a walker.** She explained that she has **trouble with activities of daily living** due to pain. She cannot vacuum, sweep, or mop due to falling. She cannot stand long enough or bend to cook. She mostly remains in her house and does not leave due to the severity

of her pain. Due to these symptoms and limitations, she
alleges an inability to work.

After careful consideration of the evidence, I find that
the claimant's medically determinable impairments could
reasonably be expected to cause the alleged symptoms;
however, the claimant's statements concerning the
intensity, persistence and limiting effects of these
**symptoms are not entirely consistent with the medical
evidence and other evidence** in the record for the reasons
explained in this decision.

The claimant has a more than 20-year history of low back
pain (Exhibit 2F at 6; 3F at 26). At the end of 2017, she
explained that her back pain waxed and waned and that it
was getting worse with radiation into her lower extremities
(Exhibit 3F at 26). At the beginning of 2018, she received
conservative treatment for her back pain (Exhibit 2F).
However, she reported an inability to tolerate physical
therapy due to falling (Exhibit 2F at 39). She experienced
weakness, numbness, and bladder changes (Id.). MRI of the
lumbar spine in April 2018 revealed disc protrusion at L3-4
flattening the ventral thecal sac and potentially
contacting the traversing L4 nerve root as well as disc
extrusion at L4-5 with slight inferior migration impinging
upon the traversing right L5 nerve root (Exhibit 3F at 44).
Examination of the claimant showed that she had very
restricted lumbar range of motion, positive straight leg
raise, and decreased sensation, and weakness in the lower
extremities (Exhibit 2F at 31; 11F). She sometimes used an
assistive device (Exhibit 2F at 28, 30; 11F at 8). **In
September 2018, the claimant underwent a L3-4, L4-5
decompression and fusion surgery** (Exhibit 2F at 1).

Following the surgery, the claimant reported **great relief
in her leg symptoms with improved sensation and functioning
of the right foot** (Exhibit 2F at 18). She reported some
muscle spasms and used a rolling walker immediately after
the surgery (Id.). **By October 2018, the claimant no longer
required the use of an assistive device** (Id. at 16). She
continued to do well, but reported some right thigh pain
and weakness (Id.). Examination revealed mild atrophy on
the right thigh, some patellofemoral tenderness, but
otherwise good strength and sensation in the lower
extremities (Id. at 17). Orthopedic treatment notes show
that the claimant's **atrophy in the distal quadriceps was**

**improving** (Id. at 14). She was **encouraged to begin to wean down her pain medication** (Id.).

In December 2018, the claimant reported that she had increased pain in her back radiating to both legs with weakness (Exhibit 10F at 1-3). Her bladder and bowel functioning was normal (Id.). However, she reported trouble getting up from a seated position, that she had trouble sleeping, and that she tired easily (Id.). She continued to use medication including Percocet and Flexeril (Id.). Examination showed **good range of motion of the lumbar spine, generally good strength with diffuse weakness in the lower extremities to 4+/5 with some breakaway (Id.). She had some softness in the quadriceps bilaterally, but it was not confirmed as atrophy** (Id.).

In January 2019, the claimant reported ongoing low back and leg pain (Exhibit 8F at 1). She also has some thoracic pain (Id.). **MRI of the lumbar spine** showed evidence of the fusion as well as mild disc bulge with **no marked central or foraminal stenosis and no direct nerve root impingement** (Exhibit 3F at 42; 8F at 2). MRI of the **thoracic spine revealed only minor degenerative changes** (Exhibit 9F at 64). EMG testing revealed denervation changes in the bilateral quadriceps and superficial peroneal sensory responses, both of unclear etiology (Exhibit 9F at 62). Overall **EMG testing did not show any marked or severe changes** (Exhibit 10F at 8). Examination of the claimant at the beginning of 2019 showed tenderness to the mid to lower thoracic region, some restricted lumbar motion, and possible distal thigh wasting (Exhibit 8F at 5). While some examinations documented decreased sensation and strength in the lower extremities, others showed **no focal motor or sensory deficits** (Exhibit 10F at 10, 12, 14). The claimant had a slightly unsteady gait, but **did not use an assistive device** (Exhibit 8F at 1; 10F at 14).

Examination of the claimant in April 2019 showed atrophy of the quadriceps muscles with weakness and some reduced reflexes (Exhibit 7F). The claimant otherwise **had intact sensation, intact coordination, and normal gait** (Id.). She was **not in acute distress and had full range of motion of the lower extremities** (Id.). **She was prescribed knee braces for stability and to help increase her walking (Id.). The claimant did not otherwise demonstrate evidence of a more global neuromuscular process** (Id.). Examination of the claimant **in May 2019 showed that the claimant did not use**

**an assistive device (Exhibit 13F at 9). She ambulated very well and was very flexible in the lower extremities** (Id. at 10). She had restricted range of motion of the lumbar spine and had tenderness over the sacrum/coccyx, but **had less atrophy and improved strength and sensation** (Id.). **X-ray of the lumbar spine showed that her hardware was in good position** (Id.). She experienced a **60% improvement from her prior level of functioning** (Id.). Notably, during a hospital admission for depression, the claimant reported low back pain limiting her ability to sleep; however, emergency room notes show that the claimant **exhibited no signs of distress or pain with ambulation and that she ambulated with a steady gait** (Exhibit 9F at 25).

At the end of 2019 and beginning of 2020, the claimant continued to report chronic pain (Exhibit 12F; 15F). Neurological examination of the claimant showed **that muscle bulk, tone, and strength were within normal limits with the exception** of some give away weakness in the both hip flexors (Id.). The claimant could not perform heel or toe walking, had antalgic gait, and reflexes were hard to obtain (Id.). However, **she had intact sensation, no muscle spasm, intact coordination, and negative Romberg testing** (Id.). The claimant went to the emergency room with complaints of back and abdominal pain radiating to the lower extremities with spasm and burning (Exhibit 16F). Examination showed that she was **alert, oriented, had intact motor functioning, intact sensation, intact coordination, no lower extremity edema, full lower extremity range of motion, and no tenderness** (Id.). She had some muscle wasting in the thighs (Id.). She **left the emergency room against medical advice and without care** (Id.).

R. 22-24 (emphasis added).

Here, the court can determine how the ALJ evaluated the plaintiff's symptoms (chronologically examined symptoms before and after surgery in light of the medical records; medical examinations; treatment; medications; diagnostic tests including MRI, EMG, and X-rays).

The ALJ gave specific reasons for the weight given the plaintiff's symptoms (60% improvement from prior level of functioning, including improved leg symptoms, sensation, atrophy, range of motion; normal muscle bulk, tone, and strength; minimal use of assistive devices; diagnostic tests, including MRI, EMG, and X-ray results).

The ALJ's findings are consistent with and supported by the evidence.[26]

Also, the ALJ found that the results of objective testing showed improvement, as an MRI no longer showed significant stenosis or nerve root impingement and instead documented mostly mild degenerative changes with intact hardware.[27]

---

[26] See R. 378, Ex.2F at 18 (9/14/18 records from Daniel George, M.D. note "She had great relief in her leg symptoms . . . . improvement of sensation and function of the right foot."); R. 374, Ex. 2F at 14 (11/19/18 records from Daniel George, M.D. note "atrophy of the distal quadriceps on the right. . . . is improving. She has full strength in anterior tibialis on the right and good sensation in the right lower extremity without deficit."); R. 374, Ex. 2F at 14 (11/19/18 records from Daniel George, M.D. note "I would like her to start cutting back significantly on the Percocet pain medication"); R. 548, Ex. 10F at 1 ("Good strength and range of motion with the lumbar spine. Diffuse weakness in the lower extremities 4+ over 5 in most muscle groups some breakaway quality at times. There is some softness to the muscle groups especially in the quadriceps, bilaterally. I can't tell if this is consistent with atrophy. Seems symmetric today. Generally good sensation in the lower extremities without deficit.").

[27] See R. 26, 446-47, Ex. 3F at 41-42 and 546-47, Ex. 9F at 65-66 (1/4/19 records from Daniel George, M.D. note MRI report "No marked central or foraminal stenoses identified. No direct nerve root impingement visualized."); R. 447, Ex. 3F at 42 (1/4/2019 Day Kimball admission diagnostic imaging requested by Daniel George, M.D. notes "disc bulge decrease in size compared with 4/8/2018", "No marked central or foraminal stenoses identified. No direct nerve root impingement visualized."); R. 472, Ex. 8F at 1 (1/18/19 records from Daniel George, M.D. note "no assistive devices"); R. 473, Ex. 8F at 2 and R. 455, Ex. 4F at 5 (1/18/19 records from Daniel George, M.D. note "Neurological: No confusion, no memory lapses or loss, good coordination, no tingling, and no numbness. . . . The patient is

alert and oriented. . . . Well-healed incision . . . . Negative Hoffman's. .
. .I don't detect a focal motor or sensory deficit. She is fully ambulatory
and does not use a cane. Gait is slightly unsteady. . . . I do not find
pathologic reflexes. . . . There is no evidence of significant foraminal or
central compression of the nerves or residual disc herniation. . . . No
evidence of significant neural compression by recent MRI."); R. 545, 9F at 64
(1/31/2019 Day Kimball Hospital diagnostic imaging requested by Daniel
George, M.D. notes "Minor multilevel thoracic spondylosis without significant
canal or foraminal stenosis, marrow edema, or intramedullary signal
abnormality."); R. 561, 10F at 14 (2/22/19 records from Daniel George, M.D.
note "Neurological: . . . good coordination, no tingling, and no numbness. .
. . Negative Hoffman's. No hyperreflexia in the lower extremities. . . . I
don't detect a focal motor or sensory deficit. She is fully ambulatory and
does not use a cane. . . . I do not find pathologic reflexes. . . .
Independent MRI of the lumbar spine was reviewed . . . . There is no evidence
of significant foraminal or central compression of the nerves or residual
disc herniation. . . . No evidence of significant neural compression by
recent MRI."); R. 559, 10F at 12 (3/22/19 records from Daniel George, M.D.
note "Neurological: . . . good coordination, no tingling, and no numbness . .
. Perhaps some restricted motion, lumbar spine. There is a well-healed
incision. There is some decreased sensation and strength, more in the right
lower extremity. There is possibly some distal thigh wasting bilaterally.
This finding is not clear. . . . An MRI of the thoracic spine was relatively
unremarkable. No evidence of severe nerve compression. Some mild spondylosis
is noted. No lesions within the thoracic spinal cord or spinal canal."); R.
463, 7F at 2 (4/10/19 records from neurologist Anthony Alessi, M.D. note
"Physical Exam: General: . . . no acute distress. . . . Extremities: . . .
full range of motion. . . . Coordination: Normal rapid alternating movements.
Sensory: Normal pinprick, vibration, light touch and temperature."); R. 464,
7F at 3 (4/10/19 records from neurologist Anthony Alessi, M.D. note "Gait:
Normal base and stride." Although one diagnosis is "Gait abnormality" "Plan
. . . There is no evidence of ongoing denervation on today's study but clearly
abnormalities and recruitment. These findings are most consistent with a
pattern of disuse atrophy or chronic L4 radiculopathies. Her greatest
difficulty is her instability with gait. I have taken the liberty of giving
her knee braces to give her some stability and hopefully help her increase
her walking. Physical therapy may also be very useful to work on building
quadricep strength. I did not find any evidence of a more global
neuromuscular process affecting this patient."); R. 557, 10F at 10 (4/19/2019
records of Daniel George, M.D. note "No motor or sensory neurologic changes
to the lower extremities."); R. 94, 13F at 10 (5/31/19 records from Daniel
George, M.D. note "She still has a significant amount of back pain but her
legs are improving and she has increased strength there. She notes less
atrophy."); R. 594, Ex. 13F at 10 (5/31/19 records from Daniel George, M.D.
note "good coordination" "incision is well-healed" "She seems to have less
atrophy and Improved strength and sensation. She is ambulating really well",
was "very flexible in the lower extremities", and "[s]he does not use a
cane." "she is 60 percent Improved at this point including some of her
atrophy and lower extremity symptoms." "At this point we are managing chronic
opioid usage for her and I have recommended she continue to wean down to
lower doses if possible."); R. 555, 10F at 8 (5/31/2019 records from Daniel
George, M.D. note "Independent EMG from Dr. Alessi and at Day Kimball
Hospital . . . no marked or severe changes. No ongoing denervation."); R.
506, Ex. 9F at 25 (6/23/19 Day Kimball Hospital admission assessment by
Emergency Department Nurse Dino G. Soscia noting "strong" "[a]bility to
[m]ove" all limbs and "[s]ensation intact" and 6/24/19 notes by Emergency

Department Nurse Ester E. Lyon observing "Pt ambulating in hallway with steady gait. No signs of acute distress or pain upon ambulation."); R. 595, 13F at 11 (6/28/19 records from Daniel George, M.D. note that although there was a prescription for a walker ("please dispense one rolling walker for daily use"), "She reported: Orthopedic options: no assistive devices"); R. 553, Ex. 10F at 6 (6/28/19 records from Daniel George, M.D. note "She seems to have less atrophy and improved strength and sensation. She is ambulating really well and is very flexible in the lower extremities. She does not use a cane. . . . Good position of a device and bone graft and pedicle screw fixation . . . . There appears to be solid fusion healing over the posterolateral regions at both levels. . . . she is 60 percent Improved at this point including some of her atrophy and lower extremity symptoms."); R. 581, Ex. 12F at 4 and 616, 15F at 4 (8/14/19 records from neurological consultation with Zofia Mroczka, M.D. note "EMG 04/10/2019 was normal, Thoracic MRI 01-31-2019 showed- minor multilevel thoracic spondylosis without significant canal or foraminal stenosis, marrow edema or intramedullary signal abnormality. Lumbar spine MRI 01-04-2019 showed-at L4-L5 mild broad disc bulge decreased in size compared to study in 2018. Status-post: L3-L4-L5 bilateral posterior fusion, normal vertebral body alignment, at L4-L5 mild posterior broad-based disc bulge decrease in size compared with 04-08-2018 . . .Musculoskeletal: no lower back pain"); R. 582, Ex. 12F at 5 and 617, Ex. 15F at 5 (8/14/19 records from neurological consultation with Zofia Mroczka, M.D. note "Muscle bulk, tone, and strength within normal limit, except giving away weakness in both hip flexors. . . . Sensation to vibration, position and temperature are normal throughout. . . . Romberg is negative."); R. 579, 12F at 2 (10/22/2019 records from neurological consultation with Zofia Mroczka, M.D. note "Muscle bulk, tone, and strength within normal limit, except giving away weakness in both hip flexors. . . . Sensation to vibration, position and temperature are normal throughout."); R. 598, 13F at 14 (12/12/19 records from Daniel George, M.D. note "No motor or sensory changes."); R. 632, 16F at 14 (12/28/19 Day Kimball Hospital Emergency Department admission records, MRI findings interpreted by David Zimmerman, M.D. note "marrow signal is within normal limits. There is straightening of the normal cervical lordosis. . . . No cord signal abnormality", "No disk abnormality" at C2-C3 and "Minimal annular bulge and endplate spurring without central canal stenosis or foraminal encroachment" at C3-C4.); R. 622, 16F at 4 (1/7/20 Day Kimball Hospital Emergency Department admission records by Mark Notash, M.D. noting "Neg,Neuro . . . Neg,Musculoskeletal" . . . "Neuro: Motor-MAE-Bilaterally/Sensory-Gross Sensory Intact/Coordination-normal", "Full ROM" of extremities with "some muscle wasting of thighs" and "patient left prior to receiving treatment/getting work up as ordered"); R. 623, 16F at 5 (1/7/20 Day Kimball Hospital Emergency Department admission records by Mark Notash, M.D. noting "Condition – Good"); R. 628, 16F at 10 (1/7/20 Day Kimball Hospital Emergency Department admission records ED Triage Nurse May H. Ulrich noted "Mode-Walked"); R. 613, 15F at 1 (3/20/20 records from neurological consultation with Zofia Mroczka, M.D. note "EMG 04/10/2019 was normal, Thoracic MRI 01-31-2019 showed- minor multilevel thoracic spondylosis without significant canal or foraminal stenosis, marrow edema or intramedullary signal abnormality. Lumbar spine MRI 01-04-2019 showed-at L4-L5 mild broad disc bulge decreased in size compared to study in 2018. Status-post: L3-L4-L5 bilateral posterior fusion, normal vertebral body alignment, at L4-L5 mild posterior broad-based disc bulge decrease in size compared with 04-08-2018"); R. 614, 15F at 2 (3/20/20 records from neurological consultation with Zofia Mroczka, M.D. note "Muscle bulk, tone, and strength within normal limit, except giving away weakness in both hip flexors. . . . Sensation to vibration, position and temperature are normal throughout.").

Here, the ALJ applied the correct legal principles and substantial evidence supports the ALJ's findings as to this issue. Where there is supporting substantial evidence, the court must defer to the ALJ, even where substantial evidence may also support the plaintiff's position.

## III.   Conclusion

For the reasons set forth above, Plaintiff's Motion for Order Reversing the Commissioner's Decision and remanding for calculation and payment of benefits or, in the alternative, for further proceedings (ECF No. 19) is hereby DENIED, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 21) is hereby GRANTED.

The Clerk shall enter judgment accordingly and close this case.

The Clerk's Office is instructed that, if any party subsequently appeals to this court the decision made after this remand, that Social Security appeal shall be assigned to the undersigned (as the District Judge who issued the ruling that remanded the case).

It is so ordered.

Dated this 28th day of March 2024, at Hartford,

Connecticut.

      /s/AWT
Alvin W. Thompson
United States District Judge
